IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHNISA TURNER, individually, | § | |
| and JOHNISA TURNER, as next | § | |
| of friend of JANE DOE, a minor, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:13-cv-932 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| *et al.*, | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This civil rights case arises from the United States' deportation of a fourteen year old who intentionally and consistently provided a false name to local Houston law enforcement officers and thereafter to immigration authorities under oath at a live hearing, leading the immigration authorities to conclude that she was a citizen of Colombia and not a citizen of the United States.

The case is before the Court on the Motion to Dismiss of Defendants James T. Hayes ("Hayes"), Kenneth Landgrebe ("Landgrebe"), John Abraham ("Abraham"), and Rolando Cortez ("Cortez," and, together with Hayes, Landgrebe, and Abraham, the "Individual Defendants") [Doc. # 11] and the Motion to Dismiss of Defendants United States of America, Eric H. Holder, Jr. ("Holder"), Janet Napolitano

("Napolitano"), Juan P. Osuna ("Osuna"), and John Sandweg[1] ("Sandweg," and, together with Holder, Napolitano, and Osuna, the "Official-Capacity Defendants")[2] [Doc. # 12].[3]  Plaintiffs Johnisa Turner ("Turner") and Johnisa Turner as next friend of Jane Doe ("JD," and, together with Turner, "Plaintiffs") have responded to both motions.[4]  The motions are ripe for decisions.  Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court **grants** Defendants' Motions to Dismiss.  Plaintiffs' causes of action against the Individual Defendants (Counts 1, 2 and 3) are **dismissed with prejudice**.  Plaintiffs' causes of action against the United States (Counts 4, 5 and 6)[5] and Plaintiffs' request for

---

[1]John Sandweg has replaced John T. Morton ("Morton") as Director of U.S. Immigration and Customs Enforcement ("ICE").  Accordingly, the Court substitutes Sandweg (in place of Morton) as an official-capacity defendant in this case. *See* FED. R. CIV. P. 25(d); *Kentucky v. Graham*, 473 U.S. 159, 166 n.11 (1985) ("In an official-capacity action in federal court, death or replacement of the named official will result in automatic substitution of the official's successor in office.").

[2]The United States, Individual Defendants, and Official-Capacity Defendants collectively will be referred to as "Defendants."

[3]The Court will refer to the Motion to Dismiss of the Individual Defendants [Doc. # 11] as "Individual Defendants' Motion" and the Motion to Dismiss of the United States and the Official-Capacity Defendants [Doc. # 12] as "Official-Capacity Defendants' Motion."

[4]Plaintiffs filed a Response to the Individual Defendants' Motion [Doc. # 18], to which the Individual Defendants filed a Reply [Doc. # 21].  Plaintiffs also filed a Response to the Official-Capacity Defendants' Motion [Doc. # 17], to which the United States and the Official-Capacity Defendants filed a Reply [Doc. # 22].

[5]As the Court explains below, *see infra* Part IV.B, no causes of action have been alleged against the Official-Capacity Defendants.

injunctive relief against the Official-Capacity Defendants are **dismissed without prejudice**.

## I.    <u>BACKGROUND</u>

On April 2, 2011, Jane Doe ("JD"), at the time fourteen years old, was arrested for shoplifting at Greenspoint Mall in Houston, Texas, and taken into custody by the Houston Police Department ("HPD").[6]  When taken into custody and at all times thereafter, JD gave HPD officers a false name, telling them that she was "Tika Cortez."[7]  Tika Cortez, as it turns out, was the name of a twenty-one year old Colombian national that Plaintiffs allege was "either wanted by Colombian officials or flagged as being in the United States illegally."[8]  JD's bail in her misdemeanor case

---

[6]Plaintiffs' Original Complaint [Doc. # 1] ("Complaint"), ¶ 25.  JD ran away from her home in Dallas, Texas, in the fall of 2010 after the death of her grandfather.  Complaint, ¶ 1, 20.  She was lured away from her home by a "child predator" who brought her down to Houston, Texas.  *Id.*, ¶¶ 20-21.  While in Houston, JD was forced to sell and consume drugs and was subject to physical and sexual abuse.  *Id.*, ¶ 23.  JD routinely "put herself at risk with men that were more than twice her age."  *Id.*  Eventually, JD ran away from her "captor" and "began trying to earn money to return to her family."  *Id.*, ¶¶ 24-25.

[7]*Id.*, ¶¶ 26-27.

[8]*Id.*, ¶ 27; *see also* Defendant Summary for Tika Cortez [Exh. B to Doc. # 11-1], at 1 (noting date of birth of Tika Cortez as March 24, 1990, and place of birth as "CB," the code for Columbia).

was set at $35,000 on the recommendation of the Harris Country District Attorney, since "Defendant is [an] illegal immigrant."[9]

Counsel was appointed for JD.[10]  JD signed the order appointing counsel "Tika Cortez."[11]  On April 4, 2011, JD, still using the name "Tika Cortez," pleaded guilty to the misdemeanor offense of theft.[12]  The one-page plea form noted that "[i]f you are not a citizen of the United States your plea will most likely effect [*sic*] your continued presence in this country."[13]  JD signed the form "Tika Cortez."[14]  JD alleges that she had no conversation with her attorney "regarding the ramifications of a guilty plea."[15]

The same day as her guilty plea, while detained in the Harris County Jail in Houston, Texas, JD was interviewed by ICE Officers Cortez[16] and Abraham.  The interview was memorialized in an immigration "Form I-213."[17]  The form summarizing JD's interview reflects that JD stated "she was [a] citizen and national

---

[9]Motion and Order Setting Bail [Exh. D to Doc. # 11-1], at 1.

[10]Complaint, ¶ 28.

[11]Request and Order for Appointment or Waiver of Counsel [Exh. C to Doc. # 11-1].

[12]Misdemeanor Plea of Guilty [Exh. E to Doc. # 11-1], at 1.

[13]*Id.*

[14]*Id.*

[15]Complaint, ¶ 28.

[16]Officer Cortez is not related to JD or Tika Cortez.

[17]Complaint, ¶ 29.

of Colombia" and "that she was not a United States citizen," gives her date of birth as March 24, 1990, and her place of birth as Bontana, Colombia.[18]   JD asserts conclusorily that she "initially asserted and insisted" that she was a United States citizen,[19] but Plaintiffs supply no detail as to the time, date, or place of any such statements.   Nowhere do Plaintiffs allege that JD ever provided the ICE officers or anyone else her true name.   Plaintiffs complain that Officers Cortez and Abraham had a desire to deport her to Colombia and "knowingly or with reckless disregard for the truth, fabricated information memorialized in the Form I-213," such as that JD was a national and citizen of Colombia (including the details of her identity) and not a citizen of the United States.[20]   Plaintiffs also complain that Officers Cortez and Abraham did not use other methods to determine JD's identity, such as fingerprint or DNA analysis, family interviews, or exploration of various databases.[21]

---

[18]Form I-213 [Exh. A to Doc. # 1], at 1-2.  It is noted that this information also is in the HPD records that were likely prepared when JD was booked or charged.  *See* Defendant Summary for Tika Cortez [Exh. B to Doc. # 11-1].

[19]Complaint, ¶ 29.

[20]*Id.*

[21]*Id.*, ¶ 31.  It is apparent that JD was also given the opportunity by the ICE officers to place a call to someone within the United States, but refused to make a call.  *See* Form I-213 [Exh. A to Doc. #1], at 3.

ICE provided JD with an English-language version of a Notice to Appear (Form I-862) on April 5, 2011, which she signed "Tika Cortez."[22]  JD also received a form notifying her of her rights (Form I-826) and oral notice of her removal hearing (Form I-862), both in Spanish, a language which she does not speak.[23]  JD signed both of these documents "Tika Cortez."[24]  After serving an eight-day sentence on her theft offense, JD apparently was taken into ICE custody on April 10, 2011, pursuant to an arrest warrant issued April 5, 2011, and prepared based on the name she gave to the HPD and ICE officers.[25]

All told, JD signed her name "Tika Cortez" at least five times during the criminal and immigration proceedings.[26]  She did not disclose any other identity.

JD appeared before Immigration Judge Saul Greenstein on April 14, 2011, for

---

[22]Notice to Appear [Exh. B to Doc. # 1].

[23]Form I-826 [Exh. A to Doc. # 18]; Notice to Appear [Exh. B to Doc. #1]; Complaint, ¶ 30.  Defendants suggest that JD received and signed Form I-862 once she was in ICE custody.  Individual Defendants' Motion, at 4; Official-Capacity Defendants' Motion, at 4-5.  However, the Notice to Appear reflects that it was served on April 5, 2011, while JD appears still to have been in state custody serving an eight-day criminal sentence, ending on April 10, 2011.  Thus, it appears that JD received and signed Form I-862 while still being held in state custody under the name of Tika Cortez, the only name she supplied to law enforcement or the court.

[24]Form I-826 [Exh. A to Doc. # 18]; Notice to Appear [Exh. B to Doc. #1].

[25]Complaint, ¶ 28; Warrant for Arrest of Alien [Exh. F to Doc. # 11-1], at 1.

[26]See Request and Order for Appointment or Waive of Counsel [Exh. C to Doc. # 11-1]; Misdemeanor Plea of Guilty [Exh. E to Doc. # 11-1]; Notice to Appear [Exh. B to Doc. # 1]; Form I-826 [Exh. A to Doc. # 18].

a master calendar hearing.[27]   At the hearing, at which multiple respondents appeared, Judge Greenstein spoke in English.  Apparently, his statements were translated into Spanish by an interpreter.[28]   All of the respondents, including JD, were placed under oath.[29]   Judge Greenstein asked the respondents to stand "[i]f anyone believes that they were born in the United States" or "[i]f anyone has a mother or father who is a United States citizen"; the transcript reflects that no respondent stood.[30]

Later, JD was questioned individually by Judge Greenstein in English.  JD stated under oath that she was **_not_** a citizen or national of the United States.[31]   She further testified under oath that she **_was_** a native and **_citizen of Colombia_**, that she arrived in the United States in 1993, that she was not admitted or paroled into the United States, and that she was removable.[32]   Judge Greenstein found that JD, under her assumed identity, was removable.[33]   JD also testified at the hearing that her only United States citizen relative (parent, child, or spouse) was a spouse by common-law

---

[27]Transcript of Immigration Hearing [Exh. A to Doc. # 11-1].

[28]*Id.* at 3:25-4:3.

[29]*Id.* at 6:2-7.

[30]*Id.* at 9:20-10:2.

[31]*Id.* at 15:1-3.

[32]*Id.* at 15:4-18.

[33]*Id.* at 15:19-20.

marriage.[34]  Finally, JD stated that she had a valid Colombian passport.[35]

None of JD's sworn testimony was true.  JD never disclosed to the immigration judge the true facts of her name, place of birth, her own citizenship, or the citizenship of her parents.  JD chose not to appeal Judge Greenstein's decision.[36]

On May 23, 2011, JD was deported to Bogota, Colombia, where she remained for approximately seven months.[37]  In December, 2011, after JD's grandmother contacted the Dallas Police Department regarding JD's wrongful deportation, JD was returned to the United States.[38]

On April 2, 2013, Johnisa Turner, JD's mother, brought this lawsuit on behalf of herself and JD.  Plaintiffs allege three causes of action against the Individual Defendants and an unspecified number of ICE Does under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971): violation of the Due Process Clause of the Fifth Amendment (Count 1); violation of the Equal Protection Clause of the Fifth Amendment (Count 2); and violation of the Fourth Amendment

---

[34]*Id.* at 16:24-18:2.

[35]*Id.* at 18:14-25.  On multiple occasions during the exchange, Judge Greenstein asked JD if she would like to speak to an attorney.  JD declined the invitation each time.  *Id.* at 14:19-22, 18:3-5, 19:8-11.

[36]*Id.* at 19:16-19.

[37]Complaint, ¶ 38.

[38]*Id.*, ¶ 38-39.

(Count 3).[39]  Plaintiffs also allege three causes of action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b): false imprisonment (Count 4); negligence (Count 5); and intentional infliction of emotional distress (Count 6).[40]  Finally, Plaintiffs seek injunctive relief against the Official-Capacity Defendants, "requiring the Attorney General, the Executive Office of Immigration Review, and the Department of Homeland Security to promulgate safeguards and policies as set forth herein and to adequately train and supervise employees in order to safeguard the rights of United States citizens subject to detention and possible deportation."[41]

## II.  <u>LEGAL STANDARD</u>

The Individual Defendants seek dismissal of all claims against them (Counts 1 through 3) under Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that Plaintiffs have not alleged a legally viable claim upon which relief can be granted.  The United States and the Official-Capacity Defendants seek dismissal of all claims or relief brought against them (Counts 4 through 6) under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for, respectively, lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

---

[39]*Id.*, ¶¶ 40-57.

[40]*Id.*, ¶¶ 58-74.

[41]*Id.*, Prayer for Relief, at 22, ¶ 5.

A.    **Failure to State a Claim**

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).  The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Harrington*, 563 F.3d at 147.  The complaint must, however, contain sufficient factual allegations, as opposed to legal conclusions, to state a claim for relief that is "plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Patrick v. Wal-Mart, Inc.*, 681 F.3d 614, 617 (5th Cir. 2012).  When there are well-pleaded factual allegations, a court should presume they are true, even if doubtful, and then determine whether they plausibly give rise to an entitlement to relief. *Iqbal*, 556 U.S. at 679.  Additionally, regardless of how well-pleaded the factual allegations may be, they must demonstrate that the plaintiff is entitled to relief under a valid legal theory. *See Neitzke v. Williams,* 490 U.S. 319, 327 (1989); *McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir. 1997).  Plaintiffs "need not establish every element of their *prima facie* case, but must nonetheless state a plausible claim for relief under the pleading standard set forth in *Twombly* and *Iqbal*." *EEOC v. Bass Pro Outdoor World, LLC*, 884 F. Supp. 2d 499, 515-16 (S.D. Tex. 2012) (Ellison, J.).

As noted, when faced with a motion to dismiss under Rule 12(b)(6), "courts must . . . accept all factual allegations in the complaint as true." *Tellabs, Inv. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A court must ordinarily limit itself to the contents of the pleadings and its attachments. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citing FED. R. CIV. P. 12(b)(6)). Thus, in the general case, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." FED. R. CIV. P. 12(d); *see also In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007).

However, a court may consider certain other documents without treating the motion as one for summary judgment. "Documents that a defendant attaches to a motion to dismiss are [also] considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Id.* (quoting *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004)); *see also Hicks v. Lingle*, 370 F. App'x 497, 498 (5th Cir. 2010); *Kane Enters. v. MacGregor (USA), Inc.*, 322 F.3d 371, 374 (5th Cir. 2003). "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Collins*, 224 F.3d at 499. Moreover, the Court may also consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into

the complaint by reference, and matters of which a court may take judicial notice."

*Tellabs*, 551 U.S. at 322; *see also Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995) ("Federal Courts are permitted to refer to matters of public record when deciding a 12(b)(6) motion to dismiss." (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994))); *Ratcliff v. Rainwater*, 93 F. App'x 623, 625 (5th Cir. 2004) (unpublished).[42]

## B.    Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005) (citations omitted).  In considering a challenge to subject matter jurisdiction, the district court is "free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the

---

[42]Plaintiffs have attached three exhibits to their Complaint [Doc. # 1], as well as several exhibits to their Responses to Defendants' motions to dismiss [Docs. # 17 and # 18]. The Court considers these documents in ruling on the pending motions to dismiss. Additionally, both the Individual Defendants' Motion and the Official-Capacity Defendants' Motion include appendices attaching additional exhibits [Docs. # 11 and # 12].  Plaintiffs object to these exhibits in each Response. *See* Plaintiffs' Response [Doc. # 17], at 1 ("Rather than dealing only with the pleaded facts, Defendants go OUTSIDE of the four corners of the complaint and attach and reference evidence in violation of controlling 12(b)(6) standards."); Plaintiffs' Response [Doc. # 18], at 1 (same).  However, Plaintiffs supply no authority that supports their assertion and that would preclude reliance on these documents.  Moreover, all of the documents that Defendants have submitted are either public records subject to judicial notice or incorporated into the Plaintiffs' complaint by reference, as Defendants have demonstrated in both of their motions. *See* Individual Defendants' Motion [Doc. # 11], at 2 n.4, 3 n.5, 4 nn.6-7; Official-Capacity Defendants' Motion [Doc. # 12], at 2 n.3, 3 n.4, 4 nn.5-6.  Accordingly, the Court considers these documents in ruling on the motions.

power to hear the case." *Id.* When the court's subject matter jurisdiction is challenged, the party asserting jurisdiction bears the burden of establishing it. *See Castro v. United States*, 560 F.3d 381, 386 (5th Cir. 2009).

A motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject matter jurisdiction. *Id.* The Court must "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2007).

## III.   INDIVIDUAL DEFENDANTS

### A.     Existence of a *Bivens* Remedy

At the most general level, this case raises the issue of whether a *Bivens* claim can be asserted against immigration officials for detaining and deporting a United States citizen. More precisely, however, this case presents the question whether there is a *Bivens* remedy for a United States citizen who never disclosed her true name and instead assumed the identity of a person who was a removable alien, and was thereafter deported from this country. The Court addresses only the second question.

In *Bivens v. Six Unknown Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court recognized a cause of action against federal officers for the violation of a plaintiff's constitutional rights. There, the plaintiff brought Fourth Amendment claims against federal agents based on an unconstitutional search, seizure,

and arrest performed by those agents.  *Id.* at 389-390.  The Supreme Court, reversing

the dismissal by lower courts, recognized the viability of this cause of action, noting:

> [T]he Fourth Amendment operates as a limitation upon the exercise of
> federal power regardless of whether the State in whose jurisdiction that
> power is exercised would prohibit or penalize the identical act if engaged
> in by a private citizen.  It guarantees to citizens of the United States the
> absolute right to be free from unreasonable searches and seizures carried
> out by virtue of federal authority.  And where federally protected rights
> have been invaded, it has been the rule from the beginning that courts
> will be alert to adjust their remedies so as to grant the necessary relief.

*Id.* at 392 (internal citations omitted).  In short, under *Bivens*, plaintiffs are entitled to

recover damages against federal officers who violate the victim's constitutional rights,

even when a federal statute conferring such a right is absent.  *See Carlson v. Green*,

446 U.S. 14, 18 (1980).

Two limitations on this rule apply.  First, *Bivens* claims are unavailable "when

defendants demonstrate special factors counselling hesitation in the absence of

affirmative action by Congress."  *Id.* (quoting *Bivens*, 403 U.S. at 396).  Second, no

*Bivens* remedy can be had where "defendants show that Congress has provided an

alternative remedy which it explicitly declared to be a *substitute* for recovery directly

under the Constitution and viewed as equally effective."  *Id.* at 18-19 (citing *Bivens*,

403 U.S. at 397) (emphasis in original).

With these exceptions in mind, the Supreme Court has devised a two-step

approach to determining whether to recognize a *Bivens* remedy.  *See Wilkie v.*

*Robbins*, 551 U.S. 537, 540 (2007).  First, courts must look to see "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages."  *Id.*  Second, "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation."  *Id.* (internal citation omitted).

### 1.    Existence of an Alternative Process to Protect Interests

Courts, and particularly the Supreme Court, have been wary of extending *Bivens* claims into new contexts.  *See Schweiker v. Chilicky*, 487 U.S. 412, 421 (1988) ("Our more recent decisions have responded cautiously to suggestions that *Bivens* remedies be extended into new contexts.").  In fact, since *Bivens* itself, the Supreme Court has only recognized *Bivens* remedies in two other contexts: (1) gender discrimination claims under the Due Process Clause of the Fifth Amendment brought by a congressional employee against a U.S. Congressman (where, unlike most other employment contexts, no statutory claim was available), *see Davis v. Passman*, 442 U.S. 228 (1979); and (2) cruel and unusual punishment claims in violation of the Eighth Amendment against federal prison officials, *see Carlson v. Green*, 446 U.S. 14 (1980).  Since *Carlson*, the Supreme Court has repeatedly declined to recognize

*Bivens* remedies in other contexts. *See Bush v. Lucas*, 462 U.S. 367 (1983) (violations of First Amendment rights by federal employers); *United States v. Stanley*, 483 U.S. 669 (1987) (harms incident to military service); *Schweiker v. Chilicky*, 487 U.S. 412 (1988) (wrongful denial of Social Security benefits); *FDIC v. Meyer*, 510 U.S. 471 (1994) (decisions made by federal agencies); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) (Eighth Amendment violations by private corporations acting under federal contracts); *Wilkie v. Robbins*, 551 U.S. 537 (2007) (federal officials' retaliation against private landowners); *Minneci v. Pollard*, 131 S. Ct. 617 (2012) (Eighth Amendment claims against private prison employees). The Supreme Court has not addressed, however, whether actions by federal immigration officials involving aliens or United States citizens, which actions are subject to the Immigration and Nationality Act ("INA"), can be challenged under *Bivens*.

The parties at bar disagree whether the federal immigration statutory scheme precludes a *Bivens* remedy. The Individual Defendants contend that the INA is a comprehensive regulatory scheme that provides ample opportunities for those in removal proceedings to contest the charges against them, and that Congress' plenary power over immigration counsels against recognizing a federal remedy.[43] Plaintiffs, in response, argue that the INA does not provide a meaningful remedy for the actions

---

[43]Individual Defendants' Motion [Doc. # 11], at 10-16.

that occurred here, and that, in any event, the INA is not applicable to JD because she is a United States citizen.[44]  No appellate court has addressed the issue as presented in this case.

The core threshold issue posed by this disagreement is the "context" in which this case appears.  The Individual Defendants suggest the case falls within the ambit of immigration proceedings and focus on the elaborate processes provided by the INA. Plaintiffs, in contrast, focus on JD's United States citizenship and her unlawful deportation.  As other courts have noted, "context is not defined in the case law." *Arar v. Ashcroft*, 585 F.3d 559, 572 (2d Cir. 2009) (en banc).  Courts approach this issue with caution:

> To answer this question requires us to enter by a narrow gate. Examining the availability of a *Bivens* remedy at a "high level of generality" would "invite claims in every sphere of legitimate governmental action" touching, however tangentially, on a constitutionally protected interest. Examining the question at too low a level of generality would invite never ending litigation because "every case has points of distinction." As such, we join our sister circuit and "construe the word 'context' as it is commonly used in law: *to reflect a potentially recurring scenario that has similar legal and factual components*."

*Mirmehdi v. United States*, 689 F.3d 975, 981 (9th Cir. 2012) (O'Scannlain, J.) (emphasis added).

---

[44]Plaintiffs' Response [Doc. #18], at 12, 14-15, 17-19.

This Court takes no position on the broadest issue—whether there are any circumstances in which a United States citizen who is deported can bring a *Bivens* claim.  That is a question drawn at too "high level of generality" and is not presently before this Court.

Before the Court, rather, is a more narrow and unusual issue: Is a United States citizen who declines to give her true name to federal officers, and who thus leads those officers to believe that she is a detainable and deportable alien, entitled to relief under *Bivens* on account of her detention and deportation?[45]  The Court concludes that no *Bivens* remedy is proper in this "context."  The uncontroverted facts before this Court are that JD failed to provide her real name to the ICE officers and instead used

_____

[45]Plaintiffs have made no claim of unlawful detention absent these proceedings.  For example, JD, unlike plaintiffs in other cases, does not complain of conditions of administrative confinement or the actions of officers during her arrest, *i.e.*, her treatment outside of the administrative removal processing context. *See, e.g.*, *Turkmen v. Ashcroft*, 915 F. Supp. 2d 314, 352-53 (E.D.N.Y. 2013) ("[Plaintiffs] are complaining about their treatment before they were deported . . . . [T]he Plaintiffs allege a series of acts that were directed only at them . . . with the specific intent to deny them the right to practice their religion.  They have sued the individual who they allege engaged in those acts, and there is no scheme—statutory or regulatory, comprehensive or otherwise—for a person detained in a federal facility to seek *any* remedy from an officer for intentionally and maliciously interfering with his right to practice his religion." (emphasis in original)); *Argueta v. U.S. Immigration and Customs Enforcement*, 2009 WL 1307236, at *14 (D.N.J. May 7, 2009) ("The specific conduct of which Ontaneda complains does not involve deportation proceedings in Immigration Court.  Rather, it is the entry into and search of his home by ICE agents without his consent, without a valid search or arrest warrant . . . and without probable cause . . . all of which he claims are violations of his Fourth Amendment right . . . that form the basis of Ontaneda's *Bivens* claims.").

falsely the name of a removable alien.  JD compounded this false identification by stating in writing and swearing under oath, at a live administrative hearing conducted in her native language, that she was ***not*** a United States citizen.  She also, under oath at the hearing, claimed Colombian citizenship.  By insisting on use of a false identity, an identity which she learned was that of a removable alien, and by *affirmatively denying* U.S. citizenship, JD subjected herself to the regulatory scheme of the INA in the posture of an alien.[46]

---

[46]The Court recognizes Plaintiffs' allegation that JD "asserted and insisted that she was a United States citizen."  Complaint, ¶ 29.  This allegation lacks any detail or context, such as the time, place, or manner in which JD made such an assertion.  Moreover, this allegation does not change the undisputed facts, which Plaintiffs acknowledge, *see id.*, ¶¶ 26-27, 33, that JD pleaded guilty to her misdemeanor offense as Tika Cortez, whom she then knew was an alien, *see* Misdemeanor Plea of Guilty [Exh. E to Doc. # 11-1], and testified under oath before an immigration judge that she was a Colombian citizen and was *not* a United States citizen, *see* Transcript of Immigration Hearing [Exh. A to Doc. # 11-1], at 15:1-6.  Thus, even assuming Plaintiffs' allegation to be true (as this Court must for a Rule 12(b)(6) motion to dismiss), the circumstances here suggest that JD repeatedly asserted her (fake) Colombian identity and denied her (true) United States identity.

The Court also notes Plaintiffs' allegation that Officers Cortez and Abraham "failed to confirm JD's identity with fingerprint analysis, genetically specific markers that suggest a person's origin, or other methods more definitive than just having a name and no documentation . . . . [and] failed to consult any sources to verify JD's, the alleged alien's, identity.  ICE officials failed to talk with any family members or check the Non-Immigrant Information System (NIIS) for entry information and passport number.  Nor did they contact the International Criminal Police."  Complaint, ¶ 31.  Plaintiffs also allege that Officers Cortez and Abraham failed to "tak[e] the simple step of checking [the] National Child Runaway list."  *Id.*, ¶ 30.  Plaintiffs' argument fails to account for the fact that JD, according to Plaintiffs' own pleadings and the documents provided, repeatedly signed her name as "Tika Cortez" and never provided her real name to the ICE officers; thus, the officers were without a means

(continued...)

In any event, JD had various remedies available to her under the extensive remedial administrative procedures set forth in the INA and in administrative policies, as well as other means, all of which she chose not to use.  First and foremost, she was able simply to disclose her true name and identity (and thus her U.S. citizenship), but declined to do so.  Under the Morton Memo,[47] had JD disclosed her true name and claimed U.S. citizenship, she would have been entitled to a thorough examination of her claim to citizenship, if not avoided the immigration process altogether.  *See* Morton Memo [Exh. C to Doc. # 18-1].  Furthermore, JD was entitled to, and received, a live hearing on her removability.  She was able to contest the charge that she was removable, 8 U.S.C. § 1534, and was offered opportunities for assistance and an appeal.  Finally, under the INA, had JD unsuccessfully claimed to be a United States citizen in her removal proceedings, she would have been entitled to review of

---

[46](...continued)
to check her "true identity."  Moreover, Plaintiffs have supplied no authority for the proposition that Officers Cortez and Abraham were under a legal obligation to search various databases for a person representing herself to be someone else.  There are also no allegations that JD's fingerprints were available elsewhere.

[47]The "Morton Memo" refers to a memorandum issued by former ICE Director John Morton to ICE Field Office Directors, Special Agents in Charge, and Chief Counsels on November 19, 2009.  The memorandum provides guidance to ICE officers with regard to claims to U.S. citizenship by suspected aliens, and details the steps that ICE officials should take with regard to those claims.  *See* Morton Memo [Exh. C to Doc. # 18].  The Morton Memo superseded the "Hayes Memo," a memorandum issued by former ICE Director James Hayes to ICE Field Officer Directors on November 6, 2008, that provided guidance on the same topic.  *See* Hayes Memo [Exh. E to Doc. # 18].

that claim in a federal circuit court of appeals.  8 U.S.C. § 1252(b)(5)(A) ("If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about petitioner's nationality is presented, the court shall decide the nationality claim.").  If the court of appeals determined that a genuine issue of material fact existed regarding her claim to citizenship, it could transfer the proceeding to a federal district court for a hearing on that issue.  8 U.S.C § 1252(b)(5)(B).[48]  Given the various options to contest immigration detention and deportation, the Court finds that there existed a meaningful alternative process to protect JD's interests, which makes a *Bivens* remedy improper in this case.

It is noted that the remedies available to JD could have prevented her detention and deportation.  The available remedies would not have provided an opportunity for monetary compensation after a detention or deportation.  The Supreme Court was faced with a similar issue in *Schweiker*.  There, the Court refused to create a *Bivens* remedy where federal officials improperly denied Social Security benefits to three individuals.  The Court recognized that the Social Security Act ("SSA") itself did not

---

[48]Judge Greenstein also provided JD with the opportunity to challenge her removal on administrative grounds, which JD declined.  *See, e.g.*, Transcript of Immigration Hearing [Exh. A to Doc. # 11-1], at 14:7-19:19.  While in ICE custody prior to her deportation, JD could also have brought a *habeas corpus* claim contesting her detention.

provide remedies for the alleged unconstitutional conduct, and that creating a *Bivens* remedy "would obviously offer the prospect of relief for injuries that must now go unredressed."   *Schweiker*, 487 U.S. at 424-25.   The Court, however, noted that Congress had provided "meaningful safeguards or remedies" under the SSA for those in the plaintiffs' position and that "Congress is in a better position to decide whether or not the public interest would be served" by creating a remedy for the conduct alleged.  *Id.* at 425, 427.  Furthermore, the *Schweiker* Court stressed:

> In the end, respondents' various arguments are rooted in their insistent and vigorous contention that they simply have not been adequately recompensed for their injuries . . . . We agree that suffering months of delay in receiving the income on which one has depended for the very necessities of life cannot be fully remedied by the 'belated restoration of back benefits' . . . . Congress, however, has addressed the problems created by state agencies' wrongful termination of disability benefits. Whether or not we believe that its response was the best response, Congress is the body charged with making the inevitable compromises required in the design of a massive and complex welfare benefits program.

*Id.* at 428-29.   Here, too, the Court notes that Congress, through the INA, has considered the issue of citizens who are wrongfully placed into removal proceedings, and devised a remedy allowing for those citizens to contest the proceedings in federal court.  Congress did not, however, take the further step of providing those citizens with the opportunity to seek damages against the officers who instituted those proceedings.  "Whether or not we believe that [Congress'] response was the best

response," *id.* at 429, this Court will not create, under the circumstances alleged, a remedy separate from and in addition to what Congress created.

Moreover, neither of the post-*Bivens* Supreme Court cases that have permitted *Bivens* remedies support such a holding in this case.  In *Carlson*, the Supreme Court allowed a *Bivens* claim against federal prison officials on the basis of Eighth Amendment violations because the Federal Tort Claims Act ("FTCA") was not viewed as an adequate remedy.  In that case, Congress had specifically declared (in amending the FTCA) that the FTCA and *Bivens* were meant to be "parallel, complementary causes of action."  *Carlson*, 446 U.S. at 20.  Moreover, the Supreme Court noted, among other factors, that Congress "explicitly [states] when it means to make FTCA an exclusive remedy."  *Id.*  Similarly, in *Davis*, the Supreme Court held that Congress had not enacted a scheme to remedy the plaintiff's claims, since the protections of Title VII were not extended to congressional employees.[49]  *Davis*, 442 U.S. at 247.  In short, both *Carlson* and *Davis* involved situations where, unlike the case at bar, *no* meaningful relief was available to the plaintiffs, thus impelling the Supreme Court's creation of a *Bivens* remedy.

Several circuit court cases support the conclusion that a *Bivens* remedy should

---

[49]The Supreme Court also refused to read Title VII's failure to include employees in the plaintiff's position as an implicit prohibition on remedies for someone in that position. *See Davis*, 442 U.S. at 247.

not be available in this case.  In *Mirmehdi v. United States*, 689 F.3d 975 (9th Cir. 2012) (O'Scannlain, J.), the Ninth Circuit held that aliens who complained of unlawful detention in their deportation proceedings were barred from asserting a *Bivens* claim. *See id.* at 981-82.  The court there noted that Congress, through the INA, established a "substantial, comprehensive, and intricate remedial scheme in the context of immigration."  *Id.* at 982.  The Ninth Circuit opined also that the lack of a monetary remedy under the INA was not inadvertent, and concluded that instituting a monetary remedy for aliens under *Bivens* would be "plainly inconsistent with Congress' authority in the field."  *Id.* at 982 (internal citations omitted).

Similarly, in *Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009) (en banc), the Second Circuit, sitting en banc, held that claims of aliens arising in the context of "extraordinary rendition"[50] could not be the subject of a *Bivens* remedy because of Congress' enactment of the INA.  *See id.* at 572-73.  Other cases have also rejected a *Bivens* remedy in the immigration context.  *See, e.g.*, *D'Alessandro v. Chertoff*, 2011 WL 6148756, at *4 (W.D.N.Y. Dec. 12, 2011) (rejecting *Bivens* remedy where legal permanent resident was able to challenge his unlawful immigration detention through

---

[50]"Extraordinary rendition" is "[t]he transfer, without formal charges, trial, or court approval, of a person suspected of being a terrorist or supporter of a terrorist group to a foreign nation for imprisonment and interrogation on behalf of the transferring nation." BLACK'S LAW DICTIONARY 1410 (9th ed. 2009).

a habeas proceeding).

Plaintiffs point to cases that reach the opposite conclusion.  These rulings are not binding or persuasive authority under the facts at bar.  For example, the district court in *Argueta v. U.S. Immigration and Customs Enforcement*, 2009 WL 1307236 (D.N.J. May 7, 2009), held that a *Bivens* cause of action could be created because, despite the immigration context presented, the gravamen of the complaint was that ICE agents' allegedly unconstitutional searches of multiple plaintiffs' homes,[51] searches executed without consent and without a warrant, were constitutional violations *incidental to* the subsequent removal proceedings.  *See id.* at *18-19. Accordingly, those claims did not fall within the INA's regulatory and remedial scheme.

Other decisions that Plaintiffs cite, all by district courts, are equally distinguishable.  *See Turkmen*, 915 F. Supp. 2d at 352-53 (recognizing *Bivens* claim where plaintiffs challenged the "harsh confinement policy" of the government which, among other things, discriminated against the plaintiffs on the basis of their Muslim faith); *Turnbull v. United States*, 2007 WL 2153279, at *11 (N.D. Ohio July 23, 2007)

---

[51]*Argueta* was a suit brought by thirteen plaintiffs alleging similar claims against ICE agents.  *See Argueta*, 2009 WL 1307236, at *1 ("In each case, Plaintiffs allege that ICE agents entered their home in the early morning hours without appropriate consent and/or warrants.").  The court's discussion of *Bivens* remedies dealt with five of those plaintiffs. *See id.* at *17.

(allowing *Bivens* claims based on plaintiff's removal in violation of a judicial order because "Plaintiff's proposed *Bivens* claims do not challenge the decision to remove him from this country, but rather focus upon the alleged violation of his rights that occurred incident to the administration of the removal process").[52]

Similarly, *Lyttle v. United States*, 867 F. Supp. 2d 1256 (M.D. Ga. 2012), is distinguishable from this case. In *Lyttle*, the ICE agents believed that plaintiff was a Mexican citizen with a name different from the one he used. Lyttle, a United States citizen, alleged, and the court assumed for the purposes of the defendants' motion to dismiss, that he consistently provided the ICE agents with his true name prior to and during the removal proceedings; that this name was associated in government

---

[52]Plaintiffs urge that two Fifth Circuit cases "acknowledg[e] the existence of a *Bivens* remedy for violations of constitutional rights in the context of immigration proceedings." Plaintiffs' Response [Doc. # 18], at 8 & n.1. Neither case supports this characterization. In *Pelayo v. U.S. Border Patrol Agent No. 1*, 82 F. App'x 986 (5th Cir. 2003), plaintiff brought a *Bivens* suit against border patrol agents on the grounds that the agents had wrongfully deported her son as an illegal alien, and that subsequent to his deportation the son died. The Fifth Circuit affirmed in part and vacated and remanded in part the dismissal of the suit on qualified immunity grounds. The Court of Appeals in *Pelayo* did not address the question of whether a *Bivens* claim was cognizable; significantly, there is no indication this issue was raised by the parties. Similarly, in *Martinez-Aguero v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006), the Fifth Circuit affirmed the district court's denial of summary judgment on the grounds that a citizen of Mexico had sufficient contacts with the United States such that she was able to bring a *Bivens* claim for unlawful arrest and excessive use of force under the Fourth Amendment. There, as in many of the cases Plaintiff cites, the *Bivens* claim related to the acts of a border patrol agents that were *incident to* an "immigration proceeding," the attempted entry of plaintiff into the United States. The Fifth Circuit was not asked to decide whether claims arising out of removal proceedings *per se* can give rise to a *Bivens* claim.

databases with a United States citizen; that he stated unequivocally and repeatedly to the agents that he was a United States citizen; that he persistently denied being a citizen of Mexico; that he consistently denied being the person the ICE agents asserted; that he was mentally disabled; and that the ICE agents were aware of his disability.  *See, e.g.*, *id.* at 1269-72, 1278, 1282-83.  The court there found the reasoning in *Mirmehdi* and *Arar* unpersuasive, as those cases involved individuals who were not United States citizens.  *See id.* at 1276.  Rather, the court held that a United States citizen in Lyttle's circumstances could bring a *Bivens* action to remedy alleged constitutional violations.  The court repeatedly emphasized that its holding was grounded on the facts alleged.[53]

   This Court is not persuaded by the *Lyttle* court's reasoning for application at bar.  Here, unlike in *Lyttle*, JD repeatedly stated and signed "Tika Cortez" as her name, even though she was informed that person was a Colombian citizen and removable.  Plaintiffs do not allege at any point in their 22-page complaint or their

---

[53]*See Lyttle*, 867 F. Supp. 2d at 1278 ("INA does not provide any meaningful remedy and review procedure . . . *in this case*." (emphasis added)); *id.* ("Specifically, the Court holds that a *United States citizen* with a diminished mental capacity who has been detained without probable cause, who the federal agents know claims to be a United States citizen, whose claim of citizenship is not investigated, whose claim is supported by easily accessible corroborating evidence, and who is manipulated by the federal agents through coercion and distortion of the record, should have a claim against the responsible agents to recover damages for his injuries caused by his detention and subsequent banishment from the United States." (emphasis in original)).

extensive briefing in opposition to Defendants' motions to dismiss that JD ever disclosed her real name.  Where, as in this case, a United States citizen fails to provide her real name and instead provides a false name to immigration authorities, and as a result is detained and deported as a removable alien, there can be no *Bivens* claim against the immigration officers.

## 2.    Special Factors Counseling Hesitation

The Court also notes that "special factors" present in this case counsel hesitation with regard to creating a *Bivens* remedy in this context.  Congress has plenary power with regard to the removal of aliens, and the Supreme Court has hesitated to craft a *Bivens* remedy when such powers exist.  *See Chappell v. Wallace*, 462 U.S. 296, 302-04 (1983) (rejecting *Bivens* remedy where "Congress has exercised its plenary constitutional authority over the military," because "the special nature of military life . . . would be undermined by a judicially created remedy exposing officers to personal liability at the hands of those they are charged to command").  This hesitation is especially apt in the context of removal proceedings.  *See Mirmehdi*, 689 F.3d at 982 ("[I]mmigration issues have the natural tendency to affect diplomacy, foreign policy, and the security of the nation, which further counsels hesitation in extending *Bivens*.") (internal citation omitted).  Furthermore, establishing a *Bivens* remedy in this area may have the effect of dissuading individuals from becoming

immigration officers lest they be subject to the prospect of personal liability.  *See Schweiker*, 487 U.S. at 425 ("The prospect of personal liability for official acts, moreover, would undoubtedly lead to new difficulties and expense in recruiting administrators for the programs Congress has established.").  Finally, fashioning a *Bivens* remedy here might incentivize others to provide false identities to immigration officers with the hope of either recovering damages or otherwise stymying their removal proceedings.

These factors lead the Court to conclude that it is inappropriate to fashion a *Bivens* remedy here.  To be clear, the Court does ***not*** reach and does ***not*** hold that a United States citizen who meaningfully asserts her citizenship when questioned under oath and who is subsequently detained and deported has no remedy under *Bivens*.  Rather, the Court holds that under the highly unusual circumstances of the case at bar, no *Bivens* remedy is proper.  Accordingly, the claims against the Individual Defendants (Counts 1 through 3) are **dismissed with prejudice**.

### B.   ICE Does

Plaintiffs state that they do not have sufficient information to sue the "ICE Does" under their true names.  These defendants are sued in their individual

capacities.[54]  Plaintiffs further state that they will amend the Complaint when they learn this information.[55]  Because the Court grants the Individual Defendants' Motion on the grounds that Plaintiffs have failed to state a viable claim against the Individual Defendants, and because the ICE Does are in the same posture as the Individual Defendants, the Court also dismisses the claims (if any) against the ICE Does.  *See Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001) (recognizing that when one defending party establishes that the plaintiff has no cause of action, the defense generally inures to the benefit of other similarly situated defendants).

### C.   <u>Leave to Amend</u>

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) of the Federal Rules of Civil Procedure before dismissing the action with prejudice.  *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).  The Court finds that allowing Plaintiffs to do so here "would prove to be futile."  *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003).  Plaintiffs, who are represented by counsel, filed this action nearly two years after the alleged actions occurred.  The key facts on which the causes

---

[54]Complaint, ¶ 17.

[55]*Id.*

of action could be based, if any, are already within Plaintiffs' knowledge. Furthermore, in 2012, Plaintiffs filed an almost identical complaint, based on this same set of facts, before the Honorable Sim Lake. *See Turner, et al. v. Holder, et al.*, Civil Action No. 4:12-cv-01570. In that case, Plaintiffs filed an original and two amended complaints and voluntarily dismissed the case without prejudice only in the face of defendants' motions to dismiss. Because Plaintiffs have had multiple opportunities to plead their case and because all of the information material to their causes of action is within their knowledge, the Court finds it highly unlikely that Plaintiffs can amend to state viable claims for relief against the Individual Defendants.

## IV.   UNITED STATES AND OFFICIAL-CAPACITY DEFENDANTS

### A.   Failure to Exhaust Administrative Remedies

The United States enjoys sovereign immunity from lawsuits. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 411-412 (Marshall, C.J.) ("The universally received opinion is, that no suit can be commenced or prosecuted against the United States."); *Finn v. United States*, 123 U.S. 227, 232-33 (1887) (Harlan, J.) ("[T]he United States are not liable to be sued, except with their consent . . . . [T]he government is not liable to be sued, as of right, by any claimant . . ."). Congress, however, may enact legislation waiving the Government's immunity. Waivers of sovereign immunity must be strictly construed and limited to the manner prescribed by Congress. *See*

*Lane v. Pena*, 518 U.S. 187, 192 (1996) ("[A] waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign."); *Reid v. United States*, 211 U.S. 529, 538 (1909) ("Suits against the United States can be maintained, of course, only by permission of the United States, and in the manner and subject to the restrictions it may see fit to impose.").

The FTCA serves as a limited waiver of the Government's sovereign immunity for suits arising from certain torts of federal employees. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217-18 (2008).  It provides that:

> The district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

In order to bring a claim under the FTCA, a plaintiff must first present her claim to the federal administrative agency responsible for the actions underlying the claim. 28 U.S.C. § 2675(a) ("An action shall not be instituted upon a claim against the United States for money damages . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing . . .").  The plaintiff must present the claim to the agency

within two years of the claim's accrual.  28 U.S.C. § 2401(b).  If the agency denies the claim, the plaintiff then has six months to commence an action against the United States in federal court.  *Id.*  A claim is deemed "denied" if the agency fails to make a "final disposition of a claim" within six months of it being presented to the agency. 28 U.S.C. § 2675(a).

The requirement that a plaintiff must first exhaust administrative remedies is a jurisdictional bar for any FTCA action—that is, if a plaintiff fails to first fully present the claim to an administrative agency, any causes of action brought in federal court must be dismissed for lack of subject matter jurisdiction.  *See McNeil v. United States*, 508 U.S. 106, 111 (1993) ("The command that an 'action shall not be instituted . . . unless the claimant shall have first presented the claim to the appropriate Federal agency . . .' is unambiguous.  We are not free to rewrite the statutory text.").  This is the case even if the administrative claim was subsequently denied before substantial progress had taken place in the litigation.  *See id.* at 110-12.

Plaintiffs presented their claims to the Department of Homeland Security ("DHS") and to Immigration and Customs Enforcement ("ICE") on February 6, 2013.[56]  Plaintiffs filed this case on April 2, 2013.  At that time, Plaintiffs "had not yet

---

[56]Declaration of Steven G. Ohrvall [Exh. H-2 to Doc. # 12-1], ¶ 3.

received a denial of the claim."[57]   Furthermore, six months had not yet elapsed between when the claim was presented to DHS and ICE and when the causes of action were filed in this Court.  Under *McNeil*, therefore, the FTCA claims against the United States must be dismissed for lack of subject matter jurisdiction.

Plaintiffs concede that they did not exhaust administrative remedies before filing this suit, but argue that they had to file their complaint "to preserve the claim from being barred by the statute of limitations."[58]   Whether or not the statute of limitations was about to expire on one or more of Plaintiffs' claims, this Court can adjudicate only cases within its subject matter jurisdiction.  Because Plaintiffs have failed to exhaust their administrative remedies, Plaintiffs' causes of action do not fall within this Court's jurisdiction.  Accordingly, Plaintiffs' FTCA claims against the United States (Counts 4 through 6) are **dismissed without prejudice** to their refiling once Plaintiffs have exhausted their administrative remedies.

### B.   Injunctive Relief against Official-Capacity Defendants

Plaintiffs have sued Official-Capacity Defendants Holder, Osuna, Napolitano, and Sandweg solely in their official capacities.[59]   The Complaint does not set forth any

---

[57]Plaintiffs' Response [Doc. # 17], at 8.

[58]Complaint, ¶ 63; *see also* Plaintiffs' Response [Doc. # 17], at 8.

[59]Complaint, ¶¶ 9-12.

facts regarding conduct by these officials.[60]  Moreover, none of Plaintiffs' six causes of action are alleged against the Official-Capacity Defendants.[61]  Rather, Plaintiffs seek only injunctive relief as a remedy against these defendants, "requiring the Attorney General, the Executive Office of Immigration Review, and the Department of Homeland Security to promulgate safeguards and policies as set forth herein and to adequately train and supervise employees in order to safeguard the rights of United States citizens subject to detention and possible deportation."[62]

A request for an injunction must be predicated upon a viable cause of action. *See, e.g.*, *Turnbow v. PNC Mortg.*, 2013 WL 5410075, at *7 (S.D. Tex. Sept. 25, 2013) (Harmon, J.) ("To sustain a claim for injunctive relief, a plaintiff must first plead a viable underlying cause of action."); *Denman v. Wells Fargo Bank, N.A.*, 2013 WL 1866580, at *2 (W.D. Tex. May 2, 2013) ("[A] request for injunctive relief must be dismissed unless it is supported by a viable claim . . . . Here, Plaintiffs have not

---

[60]*See id.*, ¶¶ 20-39. The Complaint refers to the "Morton Memo," authored by former Director of ICE John Morton (who was previously an official-capacity defendant in this case).  *See id.*, ¶¶ 12, 30-31.  However, Plaintiffs do not criticize that memorandum; on the contrary, they cite to it as a baseline for proper conduct.  *See id.*, ¶ 30 ("Unfortunately ICE Defendants Rolando Cortez and John Abraham were so focused on JD's deportation they failed to adhere to the Morton Memo or do any due diligence on the many red flags negating JD being deportable to Colombia.").

[61]*See id.*, ¶¶ 40-74.

[62]*Id.*, Prayer for Relief, at 22, ¶ 5.

asserted any cause of action against Defendant."); *Hudson v. Bd. of Regents of Tex. S. Univ.*, 2008 WL 2754622, at *6 n.6 (S.D. Tex. July 14, 2008) (Ellison, J.) ("Plaintiffs may not request injunctions that relate to unmeritorious federal law claims."); *cf. Pajooh v. Harmon*, 82 F. App'x 898, 899 (5th Cir. 2003) (upholding denial of injunctive relief where district court had dismissed *Bivens* suit for failure to state a claim).   Plaintiffs have not alleged *any* cause of action against the Official-Capacity Defendants.   Accordingly, their request for injunctive relief is **denied without prejudice**.

## V.   <u>CONCLUSION</u>

The Court does not in any way condone deportation or removal of United States citizens by immigration authorities.   The Court's conclusions above are narrow and targeted.   Guidance by the United States Supreme Court over many years strictly limiting the availability of claims against federal officers for money damages, when no such relief is provided for by Congress, establishes that Plaintiffs cannot assert a claim against the immigration officers sued under the undisputed facts presented here.

The Court lacks jurisdiction over Plaintiffs' claims against the United States and those sued in their official capacities.

For all the foregoing reasons, it is therefore

**ORDERED** that the Individual Defendants' Motion to Dismiss [Doc. # 11] is

**GRANTED**.  Plaintiffs' claims against the Individual Defendants are **DISMISSED WITH PREJUDICE**.  It is further

**ORDERED** that the United States and Official-Capacity Defendants' Motion to Dismiss [Doc. # 12] is **GRANTED**.  Plaintiffs' claims against the United States and the Official-Capacity Defendants are **DISMISSED WITHOUT PREJUDICE**.

A final order of dismissal will be filed separately.

SIGNED at Houston, Texas this 31st day of **October, 2013.**

Nancy F. Atlas
United States District Judge